```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                    EASTERN DIVISION
```

Charitie Marie Sacks,           :

    Plaintiff,              :

   v.                          :     Case No. 2:15-cv-2315

Carolyn W. Colvin, Acting       :     JUDGE MICHAEL H. WATSON
Commissioner of Social Security,      Magistrate Judge Kemp

    Defendant.              :

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, Charitie Marie Sacks, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for social security disability benefits and supplemental security income. Those applications were filed on February 22, 2012, and alleged that Plaintiff became disabled on November 1, 2011.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on October 4, 2013. In a decision dated December 5, 2013, the ALJ issued a decision denying benefits. That became the Commissioner's final decision on April 6, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on August 7, 2015. Plaintiff filed her statement of specific errors on September 11, 2015, to which the Commissioner responded on November 30, 2015. No reply brief was filed, and the case is now ready to decide.

### II. The Lay Testimony at the Administrative Hearing

Plaintiff, who was 31 years old at the time of the administrative hearing and who is a high school graduate with three years of college work, testified as follows. Her testimony

appears at pages 44-70 of the administrative record.

Plaintiff first testified that she had a nervous breakdown on November 1, 2011.  She was very anxious when she woke up that day and was not able to function.  She said that November and December were difficult months for her due to past deaths of relatives or people she was close to, and that those might have been the triggers for her breakdown.

Plaintiff saw a physician for back pain once every three months.  She saw her psychiatrist monthly and her case manager several times per month.  She was taking anti-anxiety medications but they helped her condition only to a certain extent.

As far as why she could not work, Plaintiff said that the type of work she was qualified for required constant standing and lifting.  She was unable to do those activities.  Additionally, she did not handle stressful situations well.  She could understand and remember simple instructions, but had a temper and did not always get along with co-workers and supervisors or with the public.  She could make simple work decisions and avoid work hazards.  Plaintiff said she could not sit and work at a computer all day due to back pain, could barely walk down the street, and could not lift children.  She could carry two gallons of water but lifting put a strain on her back which radiated into her hips, legs, and shoulders.  She also found it stressful to be around too many people.

Plaintiff testified that her depression caused her to lose sleep.  She also had crying spells several times per week.  She was prone to bouts of anger and sadness as well.  She explained that her last job, which was telephone sales, agitated her because of the constant phone calls.  She did socialize with family members but no one else.  She had panic attacks several times a week, which lasted for thirty minutes to an hour.  She could tolerate shopping if there were not a lot of people around.

When asked to describe her back pain, Plaintiff said that it a constant sharp pain across her entire back.  It radiated into both legs, but more so on the right side.  Medication helped to reduce the pain.  Her most comfortable position was lying down.  Any activity could exacerbate her pain or cause her legs to become numb.  She could stand for five or ten minutes, walk a block, and sit for 30 to 45 minutes.  She could not sit through an eight-hour work day even with changing positions.  She could climb a flight of stairs, but slowly.  Plaintiff left her apartment only once a week, usually for medical appointments, and avoided using public transportation.  She had to lie down several times a day for 30 to 45 minutes.

### III.  The Medical Records

The medical records in this case are found beginning on page 281 of the administrative record.  The pertinent records - those relating to Plaintiff's psychological conditions - can be summarized as follows.

In 2001, when Plaintiff was 19, she drove her car down an embankment and into a wall in an apparent suicide attempt.  She was treated at an emergency room for back strain and depression with suicidal ideation.  (Tr. 304).  She then spent five days in the hospital where she was diagnosed with bipolar affective disorder.  Her GAF was rated at 60 on the date of discharge, and she had responded well to medication and therapy.  (Tr. 316-17).

On January 17, 2012, Plaintiff was seen at Netcare, having been brought there by the Columbus police department.  She had expressed thoughts of suicide in letters to her family.  Plaintiff reported having had mood swings and sleep disturbance all of her life and symptoms of anxiety for several years.  She had not had mental health treatment for ten years.  Her mood was depressed but calm and she was oriented and logical.  Her GAF was rated at 19 and hospitalization was recommended.  (Tr. 332-36).

She was subsequently admitted to the hospital with a diagnosis of depressive disorder. At that time, she denied being suicidal but expressed interest in receiving counseling. Her GAF on discharge was 70. (Tr. 344-46). She then began counseling with North Central Mental Health Services.

At the first counseling session, Plaintiff was described as being able to complete activities of daily living at an adequate level of functioning. Her GAF was rated at 50 and she was diagnosed as suffering from bipolar II disorder without psychotic features. Other notes indicate a diagnosis of PTSD.

On April 26, 2012, Dr. Tilley, a psychologist, completed an assessment form for the Ohio Department of Job and Family Services. He said Plaintiff had ten separate moderate limitations in her ability to perform work-related functions from a mental standpoint. His narrative report indicated that Plaintiff showed signs of anxiety (although she also seemed to be "passively uncooperative") and that her responses, which he deemed to be unreliable, were "a facet of her personality pathology." He diagnosed a borderline personality disorder and rated her GAF at 50, finding her unemployable and rating her moderately impaired in every category which involved dealing with or relating to others in the workplace. (Tr. 373-75).

There are a number of treatment notes from North Central which are part of the record. The handwritten portion of those notes is very hard to decipher. They generally showed that Plaintiff carried multiple diagnoses including a mood disorder, PTSD, and bipolar disorder, and that she presented with a depressed, anxious, and irritable mood and, at times, with abnormal concentration, although her attention and cognition were normal. Social anxiety is also noted, and by November 1, 2012, there was a documented increase in both depression and anxiety. (Tr. 398). Dr. Bhatia completed an assessment form on after a

June 12, 2013 examination indicating that Plaintiff was experiencing either marked or extreme limitations in a variety of work-related functions and that she was not employable. (Tr. 408). Dr. Bhatia followed that up with a letter dated October 18, 2013 in which she stated that Plaintiff suffered from major depressive disorder, that she had been compliant with her medication regimen for over a year, that she continued to experience depression and irritability as well as racing thoughts, and that she would not likely return to a state where she could function well enough mentally to work any time in the near future. (Tr. 457).

In addition to these records of treatment, state agency psychologists expressed an opinion as to Plaintiff's mental residual functional capacity. Dr. Steiger concluded, on April 18, 2012, that Plaintiff had moderate limitations in the area of dealing with detailed instructions but could carry out one- or two-step tasks. She also was capable of superficial social interactions and could do work that did not require strict production standards. (Tr. 88-90). Dr. Warren, who had the benefit of some additional treatment records from North Central but not Dr. Bhatia's opinions, reached exactly the same conclusions. (Tr. 118-20).

## IV.  The Vocational Testimony

Dr. John Finch was called to testify as a vocational expert. His testimony begins at page 70 of the administrative record.

Dr. Finch described Plaintiff's past employment as a customer service sales person, which was sedentary and semi-skilled; as a sales representative, a light, skilled job; and as a preschool teacher, which was light and skilled as well, although Plaintiff may have performed it at a higher exertional level.

Mr. Pruitt was then given a hypothetical question which

-5-

asked him to identify any jobs which could be done by someone who could lift and carry at the light exertional level, occasionally climb ramps and stairs but never ladders, ropes or scaffolds, frequently balance, and occasionally kneel, crouch, stoop, or crawl.  The person also had to avoid unprotected heights and hazardous machinery.  From a psychological standpoint, the person was limited to the performance of simple, routine, and repetitive tasks, could be off-task for five percent of the workday, could have occasional interaction with supervisors, co-workers, and the general public, and was limited to low-stress jobs that involved only occasional changes in the work setting and did not require assembly line work.  Dr. Finch responded that such a person could do not do any of Plaintiff's past work.  He or she could work as a mail clerk, a cleaner, or a garment folder, however.  Those jobs would accommodate someone who had to adjust positions briefly.

A second hypothetical question was then asked, which described someone who was limited to sedentary work but had all of the other restrictions described in the first hypothetical question.  According to Dr. Finch, that person could work as a table worker, inspector, or document preparer.  He gave numbers for all of these jobs as they existed in the regional, State, or national economies.

Next, Dr. Finch was asked whether certain additional limitations would be work-restrictive.  He said that needing frequent supervision was inconsistent with employment, as was being off task more than 15% of the time, being able to tolerate only incidental contact with supervisors and co-workers, or needing four fifteen-minute unscheduled work breaks.

    V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 24-35 of the administrative record.  The important findings in that

decision are as follows.

    The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015.  Next, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her onset date of November 1, 2011.  Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including obesity, lumbar spine spondylolysis, sciatica, and affective, anxiety, and personality-related disorders.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

    Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work.  She could frequently balance and could occasionally climb ramps and stairs, kneel, crouch, stoop, or crawl.  She had to avoid unprotected heights and hazardous machinery.  From a psychological standpoint, she could be off-task for five percent of the workday was limited to the performance of simple, routine, and repetitive tasks in a low-stress environment that involved only occasional changes in the work setting and did not require assembly line work.  Finally, she could have only occasional interaction with supervisors, co-workers, and the general public.  With these restrictions, the ALJ concluded that Plaintiff could not perform her past relevant work.  Somewhat inconsistently, the ALJ then found that Plaintiff could perform the light jobs identified by Dr. Finch.  Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

        VI.   <u>Plaintiff's Statement of Specific Errors</u>

    In her statement of specific errors, Plaintiff raises two

issues: (1) the ALJ erred in the weight assigned to the opinion of the treating psychiatrist, Dr. Bhatia; and (2) the ALJ erred by finding that Plaintiff could perform light jobs even though she was limited to sedentary work.  These issues are evaluated under the following legal standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'"  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" <u>Id</u>.  <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

### A.  <u>Dr. Bhatia's Opinion</u>

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight

-8-

substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

As in any case where the ALJ's rationale in rejecting the opinion of a treating source is called into question, it is helpful to explain exactly what the ALJ decided.  Here is what the ALJ said about Dr. Bhatia's opinion.

The ALJ first cited to the state agency psychologists' opinions and found that they accurately reflected Plaintiff's mental limitations, although the ALJ added a limitation concerning being off task for 5% of the workday.  Dr. Tilley's assessment, which the ALJ interpreted as assessing no greater than moderate work limitations (although there were quite a number of these, which, in Dr. Tilley's view, made Plaintiff unemployable), was given little weight.  Finally, Dr. Bhatia's

-9-

opinions were also given little weight because, first, "the question of disability is a matter reserved for the Commissioner" (Tr. 31), and second, "Dr. Bhatia's opinion and indication of marked and extreme limitation are inconsistent with the medical evidence of record, the claimant's actual activities of daily living (as summarized below), and her own testimony in which she said that she could understand, remember, and carry out simple instructions."  (Tr. 32).  After so concluding, the ALJ discussed GAF scores (giving them little weight as well), the credibility of Plaintiff's testimony, and the fact that Plaintiff was able to live alone, listen to music, clean, prepare meals, take care of her personal needs, go to medical appointments, shop once a month, handle her checkbook, watch television, and talk on the phone daily.  According to the ALJ, this "level of activity is not consistent with the level and persistence of symptoms that [Plaintiff} alleges," nor was her regime of conservative medical treatment.

　　　Plaintiff asserts that the reasons given by the ALJ are too conclusory to satisfy the regulatory "good reason" requirement. In particular, she notes that the ALJ did not specifically identify what medical evidence was deemed to be inconsistent with Dr. Bhatia's opinion, and she contends that the treatment notes prepared by Dr. Bhatia, which showed only minimal improvement despite a lengthy course of treatment, fully support the doctor's opinions.  So, too, do the records indicating Plaintiff's treatment with Netcare after she expressed suicidal thoughts and the six days of inpatient treatment she underwent after Netcare was unable to stabilize her.  Finally, Plaintiff argues that Dr. Tilley's findings lend additional support to Dr. Bhatia's opinions.

　　　In response, the Commissioner characterizes Plaintiff's argument as nothing more than a disagreement with the ALJ's weighting of the medical opinions and contends that even Dr.

Bhatia's own treatment notes do not support the opinions rendered.  The Commissioner points out that consistency with the record is the hallmark of a valid medical opinion, and argues that the ALJ had a substantial basis for determining that such consistency did not exist here.

There are a number of problems with the Commissioner's argument.  First, the ALJ did not mention the alleged inconsistency between Dr. Bhatia's treatment notes and her opinions as a basis for discounting her opinion.  As this Court has said, "'[I]t is the opinion given by an administrative agency rather than counsel's 'post hoc rationale' that is under the Court's consideration.'" Evans v. Comm'r of Social Security, __ F.Supp.3d __, 2015 WL 4592449, *5 (S.D. Ohio Aug. 18, 2015), quoting Romig v. Astrue, 2013 WL 1124669, *6 (N.D. Ohio Mar. 18, 2013) (citations omitted).  Second, although the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the "medical evidence of record," it was just that - a general statement devoid of any specific reference to any portion of the medical evidence.  Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.  As this Court explained in Hardy v. Comm'r of Social Security, 2013 WL 4546508, *5 (S.D. Ohio Aug. 28, 2013), adopted and affirmed 2014 WL 1091718 (S.D. Ohio March 18, 2014):

> One of the reasons why an ALJ must articulate the basis of his or her rejection of a treating source's opinion is to allow the reviewing Court to determine if the rejection is properly based upon the evidence of record. See Wilson, supra; see also Bowen v. Comm'r of Social Security, 478 F.3d 742, 749 (6th Cir. 2007) ("the goals of § 1527(d)(2) cannot be satisfied by bald speculation").  As the Court of Appeals has observed, "it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of

-11-

> record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." Friend v. Comm'r of Social Security, 375 Fed. Appx. 543, 552 (6th Cir. Apr. 28, 2010). See also Blackburn v. Colvin, 2013 WL 3967282, *7 (N.D. Ohio July 21, 2013) (finding the ALJ's articulation of this factor inadequate because "[w]hile the ALJ concluded that the treating physician's opinions were inconsistent with the medical evidence, he does not offer any explanation for his conclusion"). The same is true here; ... there is absolutely nothing in the ALJ's decision which would allow either the plaintiff or this Court to determine what part of the medical record the ALJ found to be inconsistent with [the treating source]'s opinions.

The undifferentiated generality of this statement strongly supports a remand.

The other rationales provided by the ALJ do not provide enough support for the decision to overcome this articulation error. Plaintiff's activities of daily living, at least as Plaintiff described them in her testimony, are not significantly inconsistent with how Dr. Bhatia described her. Plaintiff also described bouts of temper, affecting her ability to get along with others, problems dealing with stress, and a depressed mood with crying spells. She said she had panic attacks frequently and that they could last for thirty minutes to an hour. These are all consistent with Dr. Bhatia's assessment of marked or extreme impairments in Plaintiff's ability to stay within a schedule, work in close proximity to others, respond appropriately to supervisors, get along with coworkers, and deal with work stress. Her activities, which she described as essentially being house-bound except for going to medical appointments or to the grocery store and socializing only with family members, are also not so contradictory to Dr. Bhatia's views that they undercut them substantially. There is also the issue of Dr. Tilley's report, which, although it did not, as the

Commissioner notes, find any limitations to be more than moderate, found ten such limitations, something ordinarily problematic for sustained employment.  Given the lack of specificity in the ALJ's reasoning and the weakness of the rationales which were articulated, a remand is needed.

### B.  Light or Sedentary Work

The only other issue raised in the statement of errors relates to the ALJ's finding that Plaintiff could do only sedentary work, but relying on that portion of the vocational expert's testimony about light jobs.  That is likely, as the Commissioner argues, harmless error since the vocational expert also identified sedentary jobs which someone with the assumed residual functional capacity could perform, but a remand on the first issue raised renders this matter moot.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to

-13-

object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge